IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 12-cv-02623-RBJ

KAISER SILVERMAN GLOBAL, LLC, a Colorado Limited Liability Company,

    Plaintiff,

v.

WORD OF GOD FELLOWSHIP, INC. d/b/a Daystar Television Network,
a Georgia Nonprofit Corporation,

    Defendant.

ORDER

This matter is before the Court on the parties' Motions for Summary Judgment [ECF Nos. 60 and 61]. The motions became ripe on February 26, 2014 upon the filing of parties' respective reply briefs.[1]

**Facts and Procedural History**

This case is a contract dispute about a life insurance policy, but not a life insurance policy in the way that most Americans probably think about life insurance policies. No, this is a case about companies buying and selling as investments the life insurance policies of complete strangers. The market for transactions like these is called the secondary market for life insurance, and the policies sold there are sometimes referred to as "senior settlements" or "life settlements." Policyholders who no longer need or want their policies can sell them to investors in lieu of surrendering the policy for its cash value or letting the policy lapse. This relatively

---

[1] In the future please do not file a brief exceeding the Court's limits without seeking leave from the Court.

obscure market is the backdrop for the garden variety contract dispute before the Court in this case.

The parties are, or were, participants in the secondary market for life insurance. The plaintiff, Kaiser Silverman Global, LLC ("KSG"), is in the business of selling life settlements, and the defendant, Word of God Fellowship, Inc., doing business as Daystar Television Network ("Daystar"), was in the market to buy one or more life settlements.

In 2011, KSG offered Daystar information about the possible purchase of a life settlement insuring an individual named Mo Wahab ("Wahab Policy"). [ECF No. 60, Ex. A, at ¶ 2.] After some correspondence about the opportunity, on April 18, 2011, Daystar informed KSG that it wished to purchase the Wahab Policy and asked about "next steps." *Id.* That same day, KSG responded by asking Daystar to execute two contracts: an "Acquisition (purchase)" agreement and a "Separate fee agreement (Agent-agency Agreement)" also referred to as a Purchaser Representative, Policy Submission and Fee Agreement ("Purchaser Agreement").[2] *Id.* A few days later, KSG emailed the agreements to Daystar and quoted a total price of $1.7 million. *Id.* Daystar signed both agreements the same day. *Id.*

The Purchaser Agreement contains several clauses relevant to this case. The beginning of the agreement sets out some general parameters.

> 1. **Purchaser Representative.** The Agent shall use its commercially reasonable efforts to locate Policies for review and purchase by Purchaser. The Agent shall solely represent the Purchaser, and, under no circumstances shall the Agent represent, or be deemed to represent the owner of any Policies.
>
> 2. **Submission of Policies.** Upon locating suitable policies, the Agent shall submit such information regarding such Policies as the Agent and the Purchaser shall from time-to-time agree.

---

[2] Throughout its briefs, Daystar painstakingly refers to the Purchaser Agreement as the "Wahab Agreement" as though wishing would make it so. The Court will refer to the document by its actual name and will determine whether the facts and law indicate that it applies to more than just the Wahab policy.

[ECF No. 60, Ex. A-3.]. There is also a section discussing a fee.

> 6. **Fee.** If the Agent locates a Policy and the Purchaser, in its sole and absolute discretion, chooses to purchase the Policy, then, in the event of a successful closing of the sale of such Policy to the Purchaser, the Agent shall be entitled to such fee as shall be agreed upon in the amount and under the terms and conditions as set forth on Exhibit A hereto (the "Fee') between the Purchaser and the Agent. Fee will be due and payable to Agent within three days of proof of ownership and beneficiary resignation change to Purchaser from insurance carrier.

*Id.* There are two sections that define confidential information and restrict the disclosure and dissemination of such information. *Id.* And there is a section that prohibits the parties from attempting to squirrel out of their respective obligations under the contract.

> 11. **Non-Circumvention.** Neither Purchaser nor Agent shall attempt to circumvent this Agreement in an effort to obtain or avoid fees, fees, remunerations, influence or consideration, which, pursuant to any agreement(s) between the parties hereto, should be paid to and/or realized by the other party.

*Id.*

Finally, there are two sections that delineate remedies for breach of the confidentiality and non-circumvention sections.

> 12. **Remedies for Breach.** Agent and Purchaser acknowledge and agree that any breach of it by Section 11 of this Agreement will cause irreparable harm to the other party. Further, the Purchaser and Agent agree and acknowledge that the precise amount of the damages suffered by the other party as the result of any such breach will be difficult to determine. As a result, Purchaser and Agent acknowledge and agree that if it breaches Section 11 of this Agreement, it shall pay to the other party as liquidated damages, and not as a penalty, an amount equal to 2X the amount of payment the Purchaser or Agent, respectively, would have received under Section 6 of this Agreement.
>
> 13. **Breach of Confidentiality.** Purchaser and Agent acknowledge and agree that monetary damages do not constitute an adequate remedy for a breach or threatened breach for the confidentiality provisions of this Agreement, and accordingly the non-breaching party shall be entitled, in addition to any legal remedies which may be available to it, to immediate injunctive relief for any actual or threatened breach of the confidentiality provisions of this Agreement and to specific performance of its rights hereunder, as well as to any other remedies available at law or in equity for any threatened or actual breach.

*Id.* The Exhibit A referred to in Section 6 ("Fee") contains the terms of the Wahab deal and nothing else. After the agreements were signed, Daystar purchased the Wahab Policy and paid KSG the fee required under Section 6.

Now comes the tricky part. After the purchase of the Wahab Policy, KSG sent information to Daystar regarding another policy. [ECF No. 60, Ex. A, at ¶ 5.] This policy insured an individual named Joher Hassan and was offered by the West Coast Life Insurance Company ("Hassan Policy"). *Id.* No further agreements were executed in relation to this second policy.

On June 5, 2011, KSG sent Daystar a document that KSG calls a Confidential Executive Summary ("Executive Summary"). This document contained Mr. Hassan's medical information, social security number, and other strategic investment information. [ECF No. 61, Ex. 7.] Some of this information was shared with other entities not bound by confidentiality agreements, though the precise extent of that sharing and the motivations for doing so remain unclear. [ECF No. 60, Ex. C, at pp. 82:15-83:4; *see also* ECF No. 60, Ex. D, at #5.]

Daystar did two things with the information it received from KSG. First, it forwarded the executive summary to Greg Harper, a different senior settlement broker. [ECF No. 61, Ex. 8.] Then it asked several follow-up questions of KSG. [ECF No. 61, Ex. 9.] Later that evening, KSG responded to Daystar's questions, and Daystar forwarded KSG's responses to Greg Harper. *Id.* Several days later, Marcus Lamb, the President and CEO of Daystar, forwarded to Greg Harper additional information produced by KSG regarding the Hassan Policy. *Id.*

On August 11, 2011, Daystar purchased the Hassan Policy through Greg Harper. It paid Mr. Harper a commission, and it paid KSG nothing. [ECF No. 61, Ex. 10.] This action appears

to have been motivated, at least in part, by Mr. Harper's charging a reduced commission to Daystar. [ECF No. 61, Ex. 11.]

On September 7, 2012, KSG filed a lawsuit against Daystar in Boulder County District Court raising several claims sounding in tort, contract, and equity. Daystar filed a timely notice of removal based on diversity of citizenship on October 2, 2012. [ECF No. 1.] After a back-and-forth about a possible remand to state court, KSG abandoned its attempts to remand the case and filed an amended complaint in January of 2014. The parties have since filed cross-motions for summary judgment and replies to the respective motions.

**Standard**

The Court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden to show that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324. A fact is material "if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The Court will examine the factual record and make reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Concrete Works of Colorado, Inc. v. City and County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).

**Analysis**

Contract Liability

Both parties are asking for summary judgment on the issue of contract liability. "Interpretation of a written contract and the determination of whether a provision in the contract is ambiguous are questions of law. . . ." *Fibreglas Fabricators, Inc. v. Kylberg*, 799 P.2d 371, 374 (Colo. 1990). "The primary goal of contract interpretation is to determine and give effect to the intent of the parties." *Ad Two, Inc. v. City and Cnty. of Denver ex rel. Manager of Aviation*, 9 P.3d 373, 376 (Colo. 2000) (en banc). The starting point for any search for the intent of the parties should be the plain language of the contract. *Id.*; *see also East Ridge of Fort Collins, LLC v. Larimer & Weld Irrigation Co.*, 109 P.3d 969, 973 (Colo. 2005); *Union Rural Elec. Ass'n v. Pub. Utilities Comm'n*, 661 P.2d 247, 251 (Colo. 1983); *Radiology Prof'l Corp. v. Trinidad Area Health Ass'n*, 577 P.2d 748, 750 (Colo. 1978). Courts must construe the contract as a whole without viewing individual clauses in isolation. *Level 3 Commc'ns, LLC v. Liebert Corp.*, 535 F.3d 1146, 1154 (10th Cir. 2008).

However, extrinsic evidence may be considered where the terms of the agreement are ambiguous. *Pepcol Mfg. Co. v. Denver Union Corp.*, 687 P.2d 1310, 1314 (Colo. 1984). "When "an ambiguity has been determined to exist, the meaning of its terms is generally an issue of fact to be determined in the same manner as other factual issues. *East Ridge*, 109 P.3d at 974. Mere disagreement between the parties regarding the meaning of a term does not necessarily demonstrate an ambiguity. *Kuta v. Joint Dist. No. 50(J)*, 799 P.2d 379, 382 (Colo. 1990). "Rather, a contract is ambiguous if it is fairly susceptible to more than one interpretation." *East Ridge*, 109 P.2d at 975. Under Colorado law, "extrinsic evidence may be conditionally admitted

to determine whether the contract is ambiguous." *Id.* But absent an ambiguity, courts should interpret an agreement according to its plain and ordinary meaning. *Omnibank Parker Road, N.A. v. Employers Ins. of Wausau*, 961 F.2d 1521, 1523 (10th Cir. 1992).

In this case, no one disputes that the written agreements constitute a contract. They dispute whether the agreements cover the Hassan Policy. On that issue, the contract is ambiguous, and its interpretation is an issue of material fact for the jury. Therefore summary judgment on the issue of contract liability is mostly inappropriate.

On its face, the Purchaser Agreement appears to contemplate an ongoing relationship. The agreement refers to multiple "policies" and states that the parties will share information about the policies "from time to time." [ECF No. 60, Ex. A-3.] Thus, the plain meaning would seem to indicate that other policies located by KSG and shared with Daystar would be covered by the agreement. This is KSG's position in its motion. This position, however, overlooks the fact that the Purchaser Agreement appears to limit its application, at least in regard to fees, to just a single fee—the one agreed to in Exhibit A. *Id.* The plain language of the agreement, therefore, seems to contemplate multiple policies but it only identifies the fee to be paid in relation to one policy. And confusingly it does not suggest where or how additional fees will be integrated into this larger agreement.

Nevertheless, for the reasons explained below, I find that the non-circumvention provisions unambiguously do not apply to the Hassan Policy. The confidentiality provisions might apply to the Hassan Policy.

### *Non-Circumvention Provisions*

Daystar suggests that without a price term for the Hassan Policy, it would be impossible to form a contract regarding the policy. *See, e.g.*, *Brush Creek Airport, LLC v. Avion Park*, LLC,

7

57 P.3d 738, 745 (Colo. App. 2002) (noting that in the absence of mutual assent regarding material terms of a contract, the contract may be rescinded).  The evidence confirms that there was no agreement regarding a fee for the Hassan Policy.  When asked if Daystar agreed to pay a fee to KSG regarding the Hassan Policy, Mr. Wolfkiel responded, "They didn't agree, but they didn't not agree when it was disclosed to them," and he agreed that there was no verbal agreement to pay anything to KSG regarding this policy.  [ECF No. 60, Ex. B at 103:24-104:5, 104:14-23.]

KSG counters that the parties' intent behind the non-circumvention clause is nonetheless ambiguous because the contract contained language contemplating an on-going relationship; neither party expressed an intent to execute the termination clause; and Daystar accepted the Hassan Policy's executive summary and used the information contained therein.  I disagree.  Even assuming these behaviors reflect an intention to enter into an ongoing relationship that governed the Hassan Policy, there is nothing in the language of the agreement that suggests there was a fee for the Hassan Policy.  Therefore, there is no fee agreement that could have been breached in regard to the Hassan Policy.  The Purchaser Agreement is not "fairly susceptible" to being read in a way that applies paragraphs 11 and 12 (the non-circumvention and remedies for breach paragraphs) to the Hassan Policy.  Of course, just because Daystar cannot be found liable for breach of contract based on these paragraphs does not preclude KSG from possible recovery for breach of contract based on other paragraphs or based on theories of promissory estoppel or quantum meruit as discussed below.

### *Confidentiality Provisions*

The Purchaser Agreement speaks directly to the remedies available in event of a breach of the confidentiality provisions.  In the event of a breach of confidentiality,

> the non-breaching party shall be entitled, in addition to any legal remedies which may be available to it, to immediate injunctive relief for any actual or threatened breach of the confidentiality provisions of this Agreement and to specific performance of its rights hereunder, as well as to any other remedies available at law or in equity for any threatened or actual breach.

[ECF No. 60, Ex. A-3.]  This provision does not make reference to Exhibit A.  In light of the broad language in the Purchaser Agreement envisioning an ongoing relationship, this provision appears to entitle the non-breaching party to any legal remedy regardless of whether the policy in question was memorialized with a specific fee agreement.

Daystar cites cases suggesting that information shared with parties not bound by a confidentiality agreement precludes any argument that the information is confidential.  *See English Feedlot, Inc. v. Norden Labs, Inc.*, 833 F. Supp. 1498, 1502-03 (D. Colo. 1993); *Sw. Stainless, LP v. Sappington*, 582 F.3d 1176, 1190 (10th Cir. 2009).  Daystar then points out that KSG shared the Hassan Policy executive summary with other entities that were not bound by a confidentiality agreement.  KSG counters that the information it shared with others was different from the information it shared with Daystar.  These arguments smack of a classic fact dispute meant for the jury and not appropriate for resolution at the summary judgment stage.  Therefore, whether the parties meant for the confidentiality provision to apply to the Hassan Policy as well as whether Daystar breached that provision are ambiguous issues and summary judgment is denied on claims arising out of this provision.

Promissory Estoppel

Promissory estoppel offers an alternative avenue for enforcement of promises in the absence of a formal contract.  Under Colorado law, the elements of promissory estoppel are

> (1) a promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee; (2) action or forbearance induced by that promise; and (3) the existence of

9

>circumstances such that injustice can be avoided only by enforcement of the promise.

*Nelson v. Elway*, 908 P2d 102, 110 (Colo. 1995). Put simply, promissory estoppel requires proof of a promise, reasonable reliance on the promise, and resulting harm if the promise is not enforced. Reasonable reliance exists where a party detrimentally alters its position in reliance on a promise. *City of Thornton v. Bijou Irrigation Co.*, 926 P.2d 1, 77 n.72 (Colo. 1996) (citing *Baumgartner v. Tweedy*, 354 P.2d 586, 588 (1960)). "Whether a plaintiff has justifiably relied on a defendant's promise is an issue of law for the trial court." *Marquardt v. Perry*, 200 P.3d 1126, 1129 (Colo. App. 2008).

Here, Daystar urges the Court to find that no promises were made to KSG regarding the Hassan Policy, and even if promises were made KSG did not justifiably rely on those promises because it disclosed "virtually" identical information to other entities not bound by a confidentiality agreement. Looking at the evidence in the light most favorable to KSG (the non-moving party as far as these claims are concerned), the Court finds that no promises were made regarding a fee for the Hassan Policy, but with that exception, a jury could find the requisite elements of promissory estoppel based on promises regarding confidentiality of information.

As explained above, there are two sets of promises contained in the Purchaser Agreement: promises not to circumvent fees owed and promises not to disclose confidential information. The promises regarding fees referred specifically and exclusively to the fees contained in Exhibit A. Those fees covered the Wahab Policy but made no reference to any other policy. KSG has not pointed to any other evidence indicating that Daystar made a promise regarding payment of fees for the Hassan Policy. Therefore, as a matter of law, KSG cannot make out a promissory estoppel claim regarding payment of fees for the Hassan Policy. The promises regarding confidentiality of information, however, do not appear to be limited to the

10

Wahab Policy. Therefore a reasonable jury could conclude that Daystar promised not to share confidential information regarding the Hassan Policy.

Daystar argues that KSG could not have relied detrimentally on Daystar's promise not to disclose because KSG shared that information with other parties. Ultimately this argument boils down to a genuine issue of fact as to what information was shared with whom; whether that sharing deprived the information of its confidential nature; and whether KSG might not have shared the information with Daystar if it knew Daystar was likely to disseminate the information. As discussed above, these are issues for the jury, and summary judgment cannot be based on the absence of justifiable reliance here.

<u>Quantum Meruit</u>

Finally, KSG raises a claim to recover in quantum meruit, or "as much as deserved." Black's Law Dictionary 1255 (7th ed. 1999). Quantum meruit is an equitable claim that assumes that no contract existed between the parties. To recover under this theory, a plaintiff must prove that "(1) at plaintiff's expense; (2) defendant received a benefit; (3) under circumstances that would make it unjust for defendant to retain the benefit without paying." *Dudding v. Norton Frickey & Assocs.*, 11 P.3d 441, 444-45 (Colo. 2000) (citing *DCB Constr. Co. v. Cent. City Dev. Co.*, 965 P.2d 115, 119 (Colo. 1998)). Meeting this third prong usually requires proof of "some type of improper, deceitful or misleading conduct." *DCB Constr. Co.*, 965 P.2d at 122. Making these determinations is typically a fact-intensive inquiry. *Lewis v. Lewis*, 189 P.3d 1134, 1141 (Colo. 2008) (en banc) ("Unjust enrichment claims require that courts make extensive factual findings to determine whether a party has been unjustly enriched.") (citation omitted).

Here, Daystar argues that there is no evidence that it engaged in any wrongful or deceitful conduct. In support of that argument, Daystar quotes Mr. Wolfkiel's deposition in which he

states that if a court determined that the Purchaser Agreement did not apply to Daystar's purchase of the Hassan Policy then Daystar would have been free to obtain the policy from any other source. [ECF No. 60, Ex. B, pp. 178:16-179:2.] This is thin ice. Looking at Mr. Wolfkiel's statement in the light most favorable to KSG, it appears to be a legal conclusion that the jury might decide to ignore. Or Mr. Wolfkiel might not have been thinking about non-contract remedies when he spoke. A reasonable jury might look at the email correspondence and the actions taken by both parties and conclude that while KSG should have been more careful with its contract language, it is nonetheless clear that Daystar knew it was hoodwinking KSG out of valuable information that would not have been provided if KSG knew that Daystar would turn around and buy the Hassan Policy from another broker. Therefore, Daystar's motion for summary judgment on KSG's claim for quantum meruit is denied.

**Order**

Accordingly, the Court orders that:

1. Daystar's motion for summary judgment [ECF No. 60] is GRANTED only with respect to claims of breach of contract arising out of paragraphs 6, 11, and 12 of the Purchaser Agreement. Summary judgment with respect to KSG's remaining claims is DENIED.
2. KSG's motion for summary judgment [ECF No. 61] is DENIED.

DATED this 28th day of February, 2014.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge